No. 26-5643

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SABLE OFFSHORE CORPORATION, *et al.*,
*Plaintiffs-Appellees*,

v.

ARMANDO QUINTERO, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE CALIFORNIA DEPARTMENT OF PARKS AND RECREATION,
*Defendant-Appellant.*

**On Appeal from the United States District Court for the Central District of California**
No. 2:26-cv-02739-SVW-SSC

# OPENING BRIEF OF DEFENDANT-APPELLANT

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
ELIZABETH ST. JOHN
NORMA FRANKLIN
*Acting Senior Assistant Attorneys General*
SAMUEL P. SIEGEL
*Supervising Deputy Solicitor General*

JANE REILLEY*
*Deputy Solicitor General*
JESSICA TUCKER-MOHL
*Supervising Deputy Attorney General*
MATTHEW STRUHAR
ALICE SEGAL
*Deputy Attorneys General*

STATE OF CALIFORNIA
DEPARTMENT OF JUSTICE
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3879
Jane.Reilley@doj.ca.gov
*Attorneys for Defendant-Appellant*

November 12, 2026

# TABLE OF CONTENTS

**Page**

Introduction .......... 1
Jurisdictional Statement .......... 3
Statement of the Issues .......... 3
Background .......... 3
A. Pipelines CA-324 and 325 .......... 4
1. Gaviota State Park .......... 4
2. The Refugio Oil Spill .......... 6
3. Easement negotiations after Sable's purchase .......... 7
B. Sable's DPA request and the Wright Order .......... 9
C. Procedural history .......... 13
Summary of Argument .......... 15
Argument .......... 17
I. The Wright Order does not lawfully authorize Sable to ignore state property rights and trespass on state lands .......... 18
II. The District Court erred in granting declaratory relief and a final judgment to Sable sua sponte and without notice .......... 26
Conclusion .......... 29

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*
594 U.S. 758 (2021)....................20, 21, 22

*Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*
870 F.3d 1140 (9th Cir. 2017)....................25

*Biden v. Nebraska*
600 U.S. 477 (2023)....................22

*Cal. Ass'n of Rural Health Clinics v. Douglas*
738 F.3d 1007 (9th Cir. 2013)....................17

*Cedar Point Nursery v. Hassid*
594 U.S. 139 (2021)....................19

*Credit Suisse v. U.S. Dist. Court for Cent. Dist. of Cal.*
130 F.3d 1342....................26

*FEC v. Cruz*
596 U.S. 289 (2022)....................19

*Gregory v. Ashcroft*
501 U.S. 452 (1991)....................22

*Hercules Inc. v. United States*
24 F.3d 188 (Fed. Cir. 1994)....................24

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*
959 F.3d 1201 (9th Cir. 2020)....................25

*Kam-Ko Bio-Pharm Trading Co. Ltd.-Australasia v. Mayne Pharma (USA) Inc.*
560 F.3d 935 (9th Cir. 2009)....................26

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*Kansas v. Garcia*
589 U.S. 191 (2020)....................25

*Kohl v. United States*
91 U.S. 367 (1875)....................19

*Merck Sharp & Dohme Corp. v. Albrecht*
587 U.S. 299 (2019)....................18

*Murphy v. Nat'l Collegiate Athletic Ass'n*
584 U.S. 453 (2018)....................22

*Navarro v. Block*
250 F.3d 729 (9th Cir. 2001)....................26

*Olympic Forest Coal. v. Coast Seafoods Co.*
884 F.3d 901 (9th Cir. 2018)....................17

*PennEast Pipeline Co. v. New Jersey*
594 U.S. 482 (2021)....................19

*Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan*
662 F.2d 641 (9th Cir. 1981)....................27

*Salveson v. Western States Bankcard Ass'n*
731 F.2d 1423 (9th Cir. 1984)....................17

*U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*
590 U.S. 604 (2020)....................21

*United States v. 50 Acres of Land*
469 U.S. 24 (1984)....................21

*United States v. Grayson*
879 F.2d 620 (9th Cir. 1989)....................27

*United States v. Washington*
759 F.2d 1353 (9th Cir. 1985)....................17

## TABLE OF AUTHORITIES
## (continued)

Page

*Va. Uranium, Inc. v. Warren*
587 U.S. 761 (2019) .......... 25

*W. Union Tel. Co. v. Pa. R.R. Co.*
195 U.S. 540 (1904) .......... 19

*Youngstown Sheet & Tube Co. v. Sawyer*
343 U.S. 579 (1952) .......... 19, 20, 21

**STATUTES AND REGULATIONS**

28 U.S.C.
§ 1291 .......... 3, 26
§ 1331 .......... 3
§ 2201 .......... 26

49 U.S.C. § 60101 .......... 13

50 U.S.C.
§§ 4511 .......... 10
§ 4511(a)(1) .......... 10
§ 4511(a)(2) .......... 10
§ 4511(c) .......... 10
§ 4557 .......... 24

Cal. Civ. Code § 829 .......... 5

Cal. Pub. Res. Code
§ 5003 .......... 5
§ 5006(a) .......... 4
§ 5012(d) .......... 5
§ 5019.53 .......... 5

Pub. L. No. 81-774, 64 Stat. 798 (1950) .......... 11, 20

Pub. L. No. 83-95, 67 Stat. 129 (1953) .......... 11

## TABLE OF AUTHORITIES
## (continued)

Page

**OTHER AUTHORITIES**

*Adjusting Certain Delegations Under the Defense Production Act*, Exec. Order No. 14391, 91 Fed. Reg. 13,199 (Mar. 13, 2026) .......... 12

Cal. State Parks, *Gaviota State Park*, https://tinyurl.com/3ez34pmu .......... 5

Cal. Dep't of Fish and Wildlife, *Refugio*, https://tinyurl.com/49epfhzj .......... 6

Dep't of Parks and Recreation Operations Manual § 2103.2, https://tinyurl.com/4yxfexb2 .......... 6

Else, Cong. Rsch. Serv., RS20587, Defense Production Act: Purpose and Scope 2 (2009) .......... 23

*ExxonMobil Acquires Troubled Crude Oil Pipelines from Plains All American*, Noozhawk (Oct. 17, 2022), https://tinyurl.com/mr2k2mxp .......... 7

Fed. R. App. P. 4(a)(1)(B) .......... 3

Fed. R. Civ. P.
- 12(b)(6) .......... 13, 17, 26, 27
- 12(d) .......... 27
- 56(f) .......... 27

H.R. Rep. No. 81-2759 (1950) .......... 10

Lieff Cabraser Heimann & Bernstein, *Plains All American Santa Barbara Oil Spill* (May 2022), https://tinyurl.com/2n3r2624 .......... 6

Nat'l Oceanic and Atmospheric Admin., *Refugio Oil Spill Damage Assessment, Remediation, and Restoration Program*, https://tinyurl.com/yc5h4br6 .......... 6

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Neenan, Cong. Rsch. Serv. R43767, The Defense Production Act of 1950: History, Authorities, and Considerations for Congress 2 (2023) ........ 11

*Refugio oil spill cleanup costs near $100 million*, Pac. Coast Bus. Times (June 27, 2015), https://tinyurl.com/w9m9zrrm ........ 6

*Sable Offshore Corp. Investor Presentation*, U.S. Sec. and Exch. Comm'n, https://tinyurl.com/yc4k6hsm ........ 7

*Second Amendment to Senior Secured Term Loan Agreement* § 1(b), U.S. Sec. and Exch. Comm'n, https://tinyurl.com/bdev8su2 ........ 7

*Senior Secured Term Loan Agreement* §§ 2.03 and 7.01(a), U.S. Sec. and Exch. Comm'n, https://tinyurl.com/3cbv3tfc ........ 7

U.S. Dep't of Justice Office of Legal Counsel, *Preemptive Effect of Defense Production Act Order on State Law*, 50 Op. O.L.C. __ (Mar. 3, 2026) 3-4, https://tinyurl.com/wdpeaka2 ........ 10, 11

## INTRODUCTION

In March 2026, Sable Offshore Corporation began pumping oil through an onshore pipeline that had been shut down since a catastrophic oil spill in 2015 released over 120,000 gallons of oil along the Santa Barbara coastline. That pipeline runs through Gaviota State Park, real property belonging to the State of California through its Department of Parks and Recreation (State Parks). But Sable has no easement allowing it to move oil through the park, or even to keep its pipeline occupying land in the park. A prior easement expired in 2016, and while Sable had been in active negotiations with State Parks over renewing the easement, no deal had been reached at the time Sable decided to restart the pipeline. So, like any landowner suddenly faced with the unauthorized use of its property, State Parks sued Sable for trespass and sought an order compelling Sable to immediately halt its operation of the pipeline.

Around the same time, Sable filed this suit against State Parks' director, seeking a declaration that it has an unfettered right to operate the pipeline on State land over the State's objection.[1] Sable based its case on a novel order issued by U.S. Secretary of Energy Chris Wright, which invoked the Defense Production Act

[1] The plaintiff in the State's trespass action is the California Department of Parks and Recreation. The defendant in this federal action is "Armando Quintero, in his official capacity as Director of the California Department of Parks and Recreation." For simplicity, both entities are referred to in this brief as "State Parks."

(DPA) and directed Sable to "immediately commence" pumping oil through its onshore pipelines. Secretary Wright issued that order at Sable's behest, after Sable began to face financial pressure to restart the pipelines sooner than it could obtain the State's consent to do so. Sable's lobbying of the federal government yielded the Wright Order, and with it, Sable's assertion that the federal government could override the State's property rights by ordering that oil start flowing again through Gaviota State Park.

California is challenging the legality of the Wright Order in a related case. *See California v. Wright*, No. 26-5409. This case addresses a discrete, and particularly troubling, aspect of the Wright Order: the assertion that a private company can intrude upon a sovereign State's property rights based solely on the fact that the federal government has ordered it to "prioritize" certain contracts or "allocate" certain materials for national defense purposes. Sable and the federal government are wrong to advance this theory, and the district court erred in adopting it. Nothing in the text of the DPA authorizes the federal government to compel a landowner to allow private companies to access and use the landowner's property without consent—and certainly not where the landowner is a sovereign State with reserved rights under the Constitution. The district court's conclusion to the contrary would give any recipient of a DPA order carte blanche to trespass upon and use any property (be it state-owned or private property), as long as doing

so allowed it to fulfill the DPA order more quickly than it otherwise would. This Court should reverse the district court's judgment to foreclose these dangerous consequences and restore California's right to protect and control access to its own land.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Sable's suit under 28 U.S.C. § 1331. The district court denied State Parks' motion to dismiss and sua sponte granted declaratory judgment to Sable on August 19, 2026. 1-ER-45-46. The notice of appeal was timely filed on August 25, 2026. 3-ER-370; Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the DPA allows the federal government to authorize a private company's trespass upon, and unpermitted use of, state lands.

2. Whether the district court erred by entering declaratory judgment for Sable sua sponte, when the only motion before it was State Parks' motion to dismiss.

## BACKGROUND

As explained in California's opening brief in the *Wright* appeal, Sable owns two onshore oil pipelines that were shut down after the catastrophic Refugio Oil Spill. *See* No. 26-5409, Dkt. 18.1 at 4-14. One of those pipelines, Line CA-325, runs through Gaviota State Park. Because the State has not permitted the transportation of oil through the portion of CA-325 that crosses its land since 2016,

Sable sought an easement from State Parks that would allow it to restart the pipeline. But while the easement negotiations were underway, Sable also pursued a separate path: it asked the federal government to attempt to override California's property rights. The Secretary of Energy acceded to Sable's request by issuing an order under Title I of the DPA, directing Sable to "immediately commence" operating CA-325. 3-ER-255. Since that order issued in March 2026, Sable has trespassed on California's land by transporting oil across Gaviota State Park without an easement.

### A. Pipelines CA-324 and 325

The Santa Ynez Unit is a set of offshore oil platforms located in federal waters off the coast of Santa Barbara, California. 2-ER-194-195; 3-ER-254. Offshore pipelines carry crude oil from the Santa Ynez Unit to an onshore processing facility in Las Flores Canyon, California. *Id.* Two onshore pipelines, Lines CA-324 and 325, connect the Las Flores Canyon facility to a distribution station in Kern County. 3-ER-254; 3-ER-336-337 (depicting maps of pipelines).

#### 1. Gaviota State Park

Line CA-325 passes through Gaviota State Park, which is owned, operated, and maintained by State Parks. 2-ER-185; Cal. Pub. Res. Code § 5006(a). Gaviota State Park spans over 2,700 acres of coastline, oak woodland, and chapparal backcountry in Santa Barbara County, encompassing numerous ecologically

diverse habitats. 2-ER-179. It also contains significant archeological, tribal, and historic sites, such as the Las Cruces Adobe. *Id.* The park is frequented by campers, hikers, surfers, and bicyclists. Cal. State Parks, *Gaviota State Park*, https://tinyurl.com/3ez34pmu. Like all of California's parks, Gaviota State Park's purpose is to "preserve outstanding natural, scenic, and cultural values, indigenous aquatic and terrestrial fauna and flora, and the most significant examples of ecological regions of California." Cal. Pub. Res. Code § 5019.53.

As Gaviota State Park's owner, State Parks has the right to the surface of the land within the park and "everything permanently situated beneath or above it." Cal. Civ. Code § 829. California law gives State Parks discretion to grant permits and easements for oil pipelines within its parks "upon the terms as the Department may prescribe." Cal. Pub. Res. Code § 5012(d). But in exercising this discretion, State Parks must adhere to its statutory duty to administer and protect "the property under its jurisdiction for the use and enjoyment of the public." *Id.* § 5003. Encumbrances that "do little or nothing" to contribute toward State Parks' mission are "generally inappropriate," and State Parks must give "careful consideration" to the "impacts that may occur over the life of the encumbrance" when deciding whether to grant it. Dep't of Parks and Recreation Operations Manual § 2103.2, https://tinyurl.com/4yxfexb2.

### 2. The Refugio Oil Spill

In May 2015, CA-324 ruptured due to external corrosion. 2-ER-179; 3-ER-242. The pipeline's failure caused the Refugio Oil Spill, in which over 120,000 gallons of crude oil spilled onto Santa Barbara County's beaches and into the Pacific Ocean. 3-ER-242; Cal. Dep't of Fish and Wildlife, *Refugio*, https://tinyurl.com/49epfhzj. The spill degraded the coastal environment and caused widespread damage to fish, birds, and marine mammals. Nat'l Oceanic and Atmospheric Admin., *Damage Assessment, Remediation, and Restoration Program*, https://tinyurl.com/yc5h4br6. It also shut down fisheries, closed multiple beaches, and deprived the public of recreational uses such as camping and non-commercial fishing. *Id.* Cleanup operations and restoration cost approximately $96 million. *Refugio oil spill cleanup costs near $100 million*, Pac. Coast Bus. Times (June 27, 2015), https://tinyurl.com/w9m9zrrm. And the pipeline's owner at the time, Plains All American Pipeline L.P. (Plains), paid $230 million in damages to impacted property owners and fishers. Lieff Cabraser Heimann & Bernstein, *Plains All American Santa Barbara Oil Spill* (May 2022), https://tinyurl.com/2n3r2624.

CA-324 and the adjacent pipeline segment, CA-325, were shut down in the aftermath of the spill. 2-ER-195; 3-ER-242. In 2020, after years of litigation over civil penalties and remediation costs, Plains entered into a court-issued consent

decree with state and federal agencies. 3-ER-261-362 (the Consent Decree). The Consent Decree acknowledged that Plains must "achiev[e] and maintain[] full compliance" with all applicable state and local laws, regulations, and permits before it could restart the pipelines. 3-ER-310-311; *see also* 3-ER-340-341.

### 3. Easement negotiations after Sable's purchase

In 2022, while the pipelines were still inactive, they were sold to ExxonMobil. *ExxonMobil Acquires Troubled Crude Oil Pipelines from Plains All American*, Noozhawk (Oct. 17, 2022), https://tinyurl.com/mr2k2mxp. Then, in 2024, ExxonMobil sold the pipelines to Sable. *Sable Offshore Corp. Investor Presentation*, U.S. Sec. and Exch. Comm'n, https://tinyurl.com/yc4k6hsm. Sable's purchase from ExxonMobil also included the three offshore oil platforms comprising the Santa Ynez Unit, as well as the Las Flores Canyon processing facility and the offshore pipelines from the Santa Ynez Unit to Las Flores Canyon. *Id.* The purchase price was $625 million—financed by a loan from ExxonMobil to Sable. *Id.* Sable was required to repay this loan by March 31, 2027, to avoid default.[2] Sable agreed to be bound by the Consent Decree, including the

[2] *Senior Secured Term Loan Agreement* §§ 2.03 and 7.01(a), U.S. Sec. and Exch. Comm'n, https://tinyurl.com/3cbv3tfc; *Second Amendment to Senior Secured Term Loan Agreement* § 1(b), U.S. Sec. and Exch. Comm'n, https://tinyurl.com/bdev8su2.

requirement to comply with all state laws and permitting requirements related to the pipelines. 3-ER-242.

Sable purchased the pipelines without a permit or easement from State Parks that would allow it to restart CA-325. There has been no easement allowing transportation of oil through Gaviota State Park since 2016, when the 30-year easement that State Parks previously granted to Sable's predecessor expired. 2-ER-133-176, 179. From 2016 onward, State Parks granted limited, one-year permits that allowed the pipeline's owner to enter the land of Gaviota State Park for purposes of maintaining and monitoring the underground pipeline—but not to transport oil through the pipeline. 2-ER-180, 185-192. The last of those annual "right of entry" permits expired on July 26, 2026. 2-ER-186. But even when those limited permits were in effect, they did not allow the transport of oil across state lands. 2-ER-180, 187.

After purchasing the pipelines, Sable sought a 30-year easement from State Parks that would allow it to transport oil through Gaviota State Park. 2-ER-178-183. Consistent with California law and its generally applicable policies governing easement requests, *supra* p. 5, State Parks informed Sable that it needed to carefully analyze "whether and how to grant an easement that will impact this environmentally and culturally sensitive public land for decades." 2-ER-181. State Parks requested that Sable provide sufficient information that would allow it

to conduct this analysis. *Id.* But instead of working with State Parks to provide all of the requested information, Sable argued that there was no time for it to do so and insisted that State Parks issue it an immediate right of entry permit. 2-ER-180.

While the easement negotiations were still ongoing, State Parks granted Sable a one-year permit to enter Gaviota State Park for maintenance and monitoring purposes, as it had for Sable's predecessors. 2-ER-181. Sable then requested a specific short-term permit to perform a series of digs along the pipeline throughout Gaviota State Park. 2-ER-180-181. In February 2025, without having received the requested short-term permit, Sable trespassed on state property by entering Gaviota and beginning to perform digging work that exceeded the scope of the annual right of entry permit, damaging the park's natural resources. 2-ER-181. Three months later, in May 2025, State Parks issued a short-term permit to Sable that required Sable to repair the damage caused by its digging work, including revegetating the land with native plants and repairing an access road to an elementary school that Sable's vehicles damaged. 2-ER-181-182. But Sable did not properly reseed the land that it damaged, allowing invasive species to grow and erosion to occur throughout the area, and it has yet to repair the access road. *Id.*

### B. Sable's DPA request and the Wright Order

With the easement negotiations still underway and its deadline to repay the loan from Exxon approaching, *supra* p. 7, Sable began searching for a way to

evade the easement requirement altogether. In December 2025, Sable sent a letter to the U.S. Department of Energy requesting that it use the Defense Production Act (DPA) to override California's property interests and authorize Sable to restart CA-325. *See* U.S. Dep't of Justice Office of Legal Counsel, *Preemptive Effect of Defense Production Act Order on State Law*, 50 Op. O.L.C. __, (Mar. 3, 2026) 3-4, https://tinyurl.com/wdpeaka2.

Enacted in response to the outbreak of the Korean War, H.R. Rep. No. 81-2759, at 1 (1950), the DPA authorizes the President and his designees to issue orders requiring companies to "allocate" materials and facilities in certain ways and "prioritize" some contracts over others, 50 U.S.C. § 4511. Section 101(a) of the DPA contains two clauses. Under the first, the President may "require that performance under contracts or orders . . . which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract or order." *Id.* § 4511(a)(1). Under the second clause, the President may "allocate materials, services, and facilities in such manner, upon such conditions, and to such extent as he shall deem necessary or appropriate to promote the national defense." *Id.* § 4511(a)(2). And Section 101(c) tracks Section 101(a) in authorizing "the allocation of, or the priority performance under contracts or orders . . . relating to[] materials, equipment, and services in order to maximize domestic energy supplies." *Id.* § 4511(c).

The DPA initially contained seven titles. See Pub. L. No. 81-774, 64 Stat. 798, 798-815 (1950). But Congress allowed four to lapse in 1953—including Title II, which had allowed the President to "requisition . . . property or the use thereof" for the national defense. *Compare id.* at 799-800, with Pub. L. No. 83-95, 67 Stat. 129, 129-131 (1953); see Neenan, Cong. Rsch. Serv. R43767, The Defense Production Act of 1950: History, Authorities, and Considerations for Congress 2 (2023). Under the now-expired requisition authority, the President was required to determine that the need for expropriating property was "immediate and impending and . . . will not admit of delay or resort to any other source of supply." 64 Stat. at 799-800. The President was also required to "promptly determine the amount of the compensation to be paid for any property or the use thereof." *Id.* at 800.

Upon receiving Sable's letter, the General Counsel of the Department of Energy sought an opinion from the Office of Legal Counsel (OLC) within the U.S. Department of Justice. *See* U.S. Dep't of Justice Office of Legal Counsel, *Preemptive Effect of Defense Production Act Order on State Law*, 50 Op. O.L.C. __, (Mar. 3, 2026) 1, https://tinyurl.com/wdpeaka2. In March 2026, the Office of Legal Counsel (OLC) responded by issuing a legal opinion taking the novel view that a DPA order issued to Sable by the President or his delegee "would preempt the California laws currently impeding Sable from resuming production and operating the associated pipeline infrastructure." *Id.* Ten days later, the President

added the Secretary of Energy to the list of executive officers authorized to issue orders under Section 101(c) of the DPA. *Adjusting Certain Delegations Under the Defense Production Act*, Exec. Order No. 14391, 91 Fed. Reg. 13,199 (Mar. 13, 2026). That same day, Secretary Wright issued an order pursuant to Sections 101(a) and (c) of the DPA, entitled *Pipeline Capacity Prioritization and Allocation Order*. 3-ER-253-256.

The Wright Order directs Sable to "immediately prioritize and allocate pipeline transportation services for hydrocarbons" from the Santa Ynez Unit through the Santa Ynez Pipeline System, which the Order defines as including CA-325. 3-ER-254-255. It directs "[a]ny person contracting for or ordering . . . hydrocarbon transportation services from Sable from the point of production" to "prefer and utilize" capacity in the pipeline system "in preference to" transportation by other means, including any "alternative pipeline." 3-ER-255. The Wright Order does not include an end date. Instead, it orders Sable to maintain compliance "until such time as the conditions necessitating the issuance of this order abate or until Sable is directed otherwise." *Id.* Although the Wright Order itself does not refer to California's property rights, Sable and the federal government have taken the position that it authorizes Sable's trespass onto state lands. *See* 2-ER-84-90; 3-ER-238-239.

Within days after the Wright Order issued, Sable began to use it for exactly that purpose: Sable reactivated Lines CA-324 and 325 for the first time since the rupture 11 years earlier and began transporting oil through the portion of Line CA-325 that runs through Gaviota State Park, still without any easement from the State. 2-ER-194-195. After learning that Sable "ha[d] begun or imminently intend[ed] to begin" restarting CA-325 without its permission, State Parks terminated its negotiations with Sable, denied Sable's easement request, and demanded that Sable halt its trespass. 2-ER-178-179. Sable ignored State Parks' demand and continues to operate the pipeline today.

### C. Procedural History

On the same day the Wright Order issued, Sable filed a lawsuit for declaratory relief against State Parks' director, Armando Quintero. 3-ER-236. As relevant here, Sable sought a judicial declaration that "the Defense Production Act bars any legal or equitable action" by State Parks "seeking to prevent Sable from complying with the terms of the DPA Order, whether sounding in trespass, breach of contract, or any other legal theory." 3-ER-250.[3] State Parks moved to dismiss Sable's complaint under Federal Rule of Civil Procedure 12(b)(6). 2-ER-97-124.

---

[3] Sable also sought a judicial declaration that the federal Pipeline Safety Act, 49 U.S.C. § 60101 *et seq*., preempts any attempt by State Parks "to regulate, direct, oversee, inspect, control, or otherwise interfere with the operation" of Line CA-325, including by "attaching regulatory conditions in negotiations over easements or rights-of-way through Gaviota State Park." 3-ER-247, 3-ER-249-250.

Once briefing concluded, the district court took the motion to dismiss under submission without holding a hearing. 3-ER-375.

On August 19, 2026, the district court issued an omnibus order that also decided motions in several other cases involving the pipelines. 1-ER-2-46. In *Wright*, the district court denied California's motion to preliminarily enjoin the Wright Order, holding that California was unlikely to succeed on the merits. 1-ER-29-39. In making this ruling, the court expressed its view that an order issued under the DPA preempts *all* state regulatory requirements and property interests that do not "align" with the "federal executive['s] . . . actions." 1-ER-35. As a result, the court reasoned, no state regulations or property laws could apply if they created any hindrance to Sable's ability to immediately transport oil through the pipelines. 1-ER-36-39.

Turning next to this case, the district court denied State Parks' motion to dismiss. 1-ER-39-41. The court reiterated its view that the Wright Order "does, as a matter of law, preempt the enforcement of any state law that conflicts with Sable's ability to operate the Onshore Pipeline," including trespass laws. 1-ER-41. The court then went "beyond the present posture" of the motion to dismiss, determining that "not only does the DPA preemption argument survive the instant motion, but it also justifies issuing the [] requested declaratory judgment as a matter of law." *Id.* The court therefore granted declaratory relief to Sable sua

sponte, declaring that "the Defense Production Act, through Secretary Wright's allocation order, bars [State Parks] from bringing legal action to prevent Sable from complying with the DPA Order by operating the Onshore Pipeline." *Id.* Thus, the court proceeded from *denying a defendant's motion to dismiss* to summarily entering *judgment for the plaintiff*, when no one had sought that relief and before the defendant had even answered the complaint.[4]

## SUMMARY OF ARGUMENT

The district court was wrong to declare that the Wright Order bars State Parks from bringing a trespass claim against Sable for its unauthorized use of state-owned land. Even assuming that the Wright Order is a lawful allocation or prioritization order under the DPA, *but see Wright* Opening Br., No. 26-5409, Dkt. 18.1 at 21-31, it does not permit Sable to override the State's property rights by transporting oil through Gaviota State Park without an easement.

Federal agencies have no power to act unless and until they receive congressional authorization to do so, and Secretary Wright therefore had no ability to issue an order exempting Sable from California's property laws unless the DPA confers that power upon him. The Supreme Court has made clear that Congress

[4] The district court also denied State Parks' motion to dismiss the Pipeline Safety Act claim, reasoning that, "taking the pleaded facts as true, the claim survives." 1-ER-41. The court did not, however, base its final judgment on that claim.

must speak clearly when it intends to authorize federal agencies to requisition, expropriate, or otherwise take property rights—especially when the property at issue belongs to a sovereign State. The DPA includes no such clear statement, and its text bears no resemblance to the language Congress uses when drafting statutes that permit the expropriation of property. The absence of this language from the DPA's text is no accident—rather, it is the result of Congress' decision to allow the DPA's requisition authority to lapse over 70 years ago. Where, as here, Congress expressly authorizes an activity—but then allows that authorization to expire—courts should not read that same authority into ambiguous provisions that do not clearly confer it. Because Secretary Wright has no authority under the DPA to permit Sable to use California's land without the State's consent, it necessarily follows that the Wright Order cannot preempt the state's property and trespass laws.

The district court also erred in going "beyond the present posture" of State Parks' motion to dismiss (1-ER-41) and granting declaratory relief to Sable. Although the court did not say so in its order, it appears that it converted the motion to dismiss to a motion for summary judgment, then summarily adjudicated Sable's declaratory relief action sua sponte. But a court may only treat a motion to dismiss as a motion for summary judgment after giving the parties notice and a

reasonable opportunity to present all pertinent material. The district court failed to do so here.

## ARGUMENT

This Court "review[s] de novo a district court's denial of a motion to dismiss under Rule 12(b)(6)." *Olympic Forest Coal. v. Coast Seafoods Co.*, 884 F.3d 901, 905 (9th Cir. 2018). This Court also reviews de novo "a grant of declaratory relief." *Cal. Ass'n of Rural Health Clinics v. Douglas*, 738 F.3d 1007, 1011 (9th Cir. 2013). "The customary deference for the district court is not applicable to its determination to grant a declaratory judgment." *United States v. Washington*, 759 F.2d 1353, 1356 (9th Cir. 1985). This Court "must exercise its own sound discretion to determine the propriety of the district court's grant or denial of declaratory relief." *Id.* at 1356-1357. A district court's decision to convert a motion to dismiss into a motion for summary judgment is reviewed for abuse of discretion. *Salveson v. Western States Bankcard Ass'n*, 731 F.2d 1423, 1430 (9th Cir. 1984). Here, there was no basis in law to issue the requested declaratory judgment. And at a minimum, the Court should reverse because it was premature and procedurally improper to grant final declaratory relief for the plaintiff when the parties had only briefed a motion to dismiss by the defendant.

## I. THE WRIGHT ORDER DOES NOT LAWFULLY AUTHORIZE SABLE TO IGNORE STATE PROPERTY RIGHTS AND TRESPASS ON STATE LANDS

In the district court's view, Sable is entitled to a declaratory judgment that California cannot bring a trespass claim under state law for transporting oil across the State's land without an easement. *See* 1-ER-41. That is so, the district court concluded, because the Wright Order preempts "enforcement of *any state law* that conflicts with Sable's ability to operate the Onshore Pipeline, including . . . trespass [laws]." *Id.* (emphasis added). That reasoning fails on multiple levels. As explained in the State's *Wright* briefing, *see* No. 26-5409, Dkt. 18.1 at 21-31, the Wright Order is not a valid "allocation" or "prioritization" order under the DPA. If the Court agrees, that would compel reversal in this appeal as well, because an invalid DPA order can obviously have no preemptive effect. *See, e.g.*, *Merck Sharp & Dohme Corp. v. Albrecht*, 587 U.S. 299, 315 (2019) ("[T]he only agency actions that can determine the answer to the pre-emption question, of course, are agency actions taken pursuant to the [agency's] congressionally delegated authority"). But even if this Court were to hold that the Wright Order comports with the DPA, that would not mean it has the unprecedented preemptive reach given to it by the district court. For the reasons detailed in the *Wright* briefing, *see* No. 26-5409, Dkt. 18.1 at 40-44, and reiterated again here, the DPA does not authorize the federal Executive to requisition, expropriate, take, or otherwise trample on property rights, even with a valid DPA order. And because

the DPA does not grant such property-taking power, it plainly does not preempt state laws—like trespass laws—designed to safeguard property rights.

1. A federal agency "'literally has no power to act' . . . unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022). Secretary Wright therefore had no authority to allow Sable to override California's right to exclude it from state property—"'one of the most treasured' rights of property ownership," *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021)—unless the DPA permits him to do so. It does not. The DPA does not confer authority to take *anyone's* property rights away—and it certainly does not provide the clear statement necessary to invade a *sovereign State's* property rights.

When Congress intends to authorize the federal government to "take[] property for itself or someone else," *Cedar Point*, 594 U.S. at 149, it has granted that power by "express terms or by necessary implication," *e.g.*, *W. Union Tel. Co. v. Pa. R.R. Co.*, 195 U.S. 540, 569 (1904). A telltale sign that Congress wishes to grant such property-acquiring authority is the inclusion of an express mechanism by which affected property owners can seek just compensation. *See*, *e.g.*, *PennEast Pipeline Co. v. New Jersey*, 594 U.S. 482, 498-499 (2021); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 615-619 (1952) (Frankfurter, J., concurring) (collecting examples); *Kohl v. United States*, 91 U.S. 367, 374 (1875).

For example, in enacting the Selective Service Act of 1948—which was passed just two years before the DPA—Congress expressly allowed the President to "take immediate possession of" and "operate" any "plant, mine, or other facility," but required that "[f]air and just compensation shall be paid" to the seized facility's owner. *Youngstown*, 343 U.S. at 619 (Frankfurter, J., concurring). The DPA, however, contains no similar language. And the fact that Congress provided no procedure for property owners to seek compensation gives rise to the strong inference that it did not intend for orders issued under Title I of the DPA to interfere with property rights in ways that could generate takings liability. *See*, *e.g.*, *Youngstown*, *id.* at 598 (Frankfurter, J., concurring) ("Congress . . . has not left to implication that just compensation be paid: it has usually legislated in detail regarding enforcement of this . . . requirement.").

That inference is particularly persuasive here, because the DPA originally *did* provide explicit authorization to expropriate property and pay just compensation. Former Title II expressly allowed the President to requisition "real property," § 201(b), or the "use thereof," 201(a), and established a mechanism for the prompt payment of compensation, 201(a). 64 Stat. at 799-800. But Congress allowed the requisition authority to lapse in 1953 and has never reinstated it. *Supra* p. 11. The Supreme Court has long been reluctant to allow executive officials to "reimpose[]" programs that "Congress [does] not renew." *E.g.*, *Ala. Ass'n of Realtors v. Dep't*

*of Health & Hum. Servs.*, 594 U.S. 758, 760, 762 (2021) (per curiam). In *Alabama Association of Realtors*, for example, the Court rejected the CDC's attempt to impose the same type of eviction moratorium that Congress had previously authorized and then allowed to expire. And in *Youngstown*, the Court refused to allow the President to seize private steel mills. "[T]his extraordinary authority" had previously been accorded by Congress—but was "repealed after a short period." 343 U.S. at 598 (Frankfurter, J., concurring).

The Court should be especially hesitant to conclude that Congress intended the DPA to allow for interference with *state* property rights. As the Supreme Court has recognized, authorizing executive officials to "gain power over" state-owned property, *U.S. Forest Serv. v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 621 n.6 (2020), "has striking implications for federalism," *id.* at 621. Congress therefore must "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power" by authorizing executive officials to requisition property, especially state-owned property. *Ala. Ass'n of Realtors*, 594 U.S. at 764 (quoting *Cowpasture River Pres. Ass'n*, 590 U.S. at 622). Although Congress may take state-owned property interests for public use if it complies with the Fifth Amendment, *see United States v. 50 Acres of Land*, 469 U.S. 24, 31 (1984), due respect for state sovereignty under the Tenth Amendment and our Constitution's structure requires Congress to be "unmistakably clear" when

altering the federal-state balance, *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Otherwise, there is a danger that Congress could shirk "political accountability" for its actions by commandeering state-owned property for federal ends—much as there is a risk of "blurr[ing]" the lines of political accountability when Congress commandeers state personnel. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473-474 (2018). Nothing in the DPA's text comes close to the unmistakably clear language that Congress must use when authorizing federal interference with state lands.

The district court did not identify any portion of the DPA's text that could be read as authorizing the expropriation of property. But it nonetheless concluded that property rights must give way to a DPA order if they present any hindrance to a company's ability to immediately carry out the order. *See* 1-ER-41. Not only does that view defy the Supreme Court's "exceedingly clear language" requirement, *Ala. Ass'n of Realtors*, 594 U.S. at 764, but it would also have far-reaching consequences that Congress could not have reasonably intended. The "history and . . . breadth of the authority asserted by the Executive," as well as "the economic and political significance of that assertion," provide "reason to hesitate before concluding that Congress meant to confer such authority." *Biden v. Nebraska*, 600 U.S. 477, 501 (2023) (internal quotation marks omitted).

Imagine what the Executive Branch could accomplish under the sweeping view of the DPA that the district court embraced—all without the involvement of Congress. It could, for example, "allocate" the entirety of a state park—or privately owned land, such as a farm or ranch—to artificial-intelligence companies to construct data centers to power their AI platforms (or high-voltage transmission lines to serve nearby data centers) on the ground that the national defense requires that American AI companies keep pace with Chinese competitors.[5] Similarly, it could order a State or local government to turn over parkland—or large private landholders to give up their property—to power companies to construct solar farms, wind farms, or other power-generation facilities, like nuclear plants. Or consider a real-world example of a prior DPA order: an order requiring an automobile company to prioritize contracts for the development of military tanks.[6] Under Sable's view and the district court's reasoning, the automobile company could use that prioritization order in ways that Congress did not contemplate or authorize: the company could build a manufacturing plant in a state park, construct access roads through nearby farms, and install noisy, high-polluting

---

[5] *See* Brief of *Amicus Curiae* The Software & Information Industry Association in Support of Plaintiff-Appellant in *Wright*, No. 26-5409, Dkt. 27.1 at 15 (noting that "win[ning]" the "AI race" is a "core Administration goal").

[6] *See, e.g.*, Else, Cong. Rsch. Serv., RS20587, Defense Production Act: Purpose and Scope 2 (2009) (describing DPA's use to require Chrysler to prioritize contracts for development of battle tanks in the 1970s).

generators in the backyards of neighboring homes to power the new manufacturing facility. It strains credulity that Congress intended to give recipients of DPA orders these powers—particularly when Congress allowed the DPA's requisition authority to expire over 70 years ago.

2. Because the DPA does not authorize Secretary Wright to grant Sable the power to requisition California's property rights, *supra* pp. 19-24, it necessarily follows that the DPA order does not preempt state trespass laws—laws designed to safeguard property rights. Although the DPA does not contain an express preemption clause, the district court treated Section 707 of the statute much like an express preemption clause. 1-ER-35-37. But that provision merely immunizes an individual or business from "damages or penalties" for complying with a DPA order, in the event the order is ultimately "declared by judicial or other competent authority to be invalid." 50 U.S.C. § 4557. That provision would, for example, immunize a manufacturer from damages for breach of contract if it fails to meet a commercial buyer's delivery date because it received a DPA order requiring it to prioritize other contracts. *See Hercules Inc. v. United States*, 24 F.3d 188, 203 (Fed. Cir. 1994). But nothing in Section 707 purports to immunize a party like Sable from any type of trespass action, such as an action that seeks prospective relief from future trespasses. *See Wright* Opening Br., No. 26-5409, Dkt. 18.1 at

33-34. And there is certainly nothing in Section 707 that purports to preempt state trespass laws as a general matter.

Nor would there be any basis to deem state trespass laws invalid on obstacle-preemption grounds. Obstacle preemption is an implied-preemption doctrine that applies "where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1153 (9th Cir. 2017). Because "[t]he preemption of state laws represents 'a serious intrusion into state sovereignty,'" *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 773 (2019), "'a high threshold must be met' before a court will conclude that a federal law has impliedly preempted a state law," *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1212 (9th Cir. 2020). As relevant here, state trespass laws are plainly not obstacle-preempted by the DPA because the DPA does not authorize the Executive Branch to requisition, transfer, or otherwise take and appropriate non-federal property rights, whether owned by a State (as here), a local government, or a private party. *Supra* pp. 19-24; *see, e.g.*, *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) ("There is no federal preemption in vacuo." (internal quotation marks omitted)); *id.* ("In all cases, the federal restrictions or rights that are said to conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress.").

## II. THE DISTRICT COURT ERRED IN GRANTING DECLARATORY RELIEF AND A FINAL JUDGMENT TO SABLE SUA SPONTE AND WITHOUT NOTICE

The district court independently erred in granting declaratory relief and a final judgment to Sable sua sponte, when the only motion pending in the case was State Parks' motion to dismiss. A motion to dismiss under Rule 12(b)(6) is a defensive motion that "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). If a complaint fails to state a cognizable legal theory or allege sufficient facts to support a cognizable legal theory, a defendant is entitled to dismissal of the complaint. *Id.* But an unsuccessful motion to dismiss does *not* result in a final judgment for the plaintiff and against the defendant; instead, the defendant must answer the complaint and may continue to defend against the plaintiff's claims. *See Credit Suisse v. U.S. Dist. Court for Cent. Dist. of Cal.*, 130 F.3d 1342, 1345 (denial of a motion to dismiss is not a "final decision" within the meaning of 28 U.S.C. § 1291).

Declaratory relief is an affirmative remedy that has "the force and effect of a final judgment or decree." 28 U.S.C. § 2201. "[T]he requirements of pleading and practice in actions for declaratory relief are exactly the same as in other civil actions." *Kam-Ko Bio-Pharm Trading Co. Ltd.-Australasia v. Mayne Pharma (USA) Inc.*, 560 F.3d 935, 943 (9th Cir. 2009). A party seeking declaratory relief therefore must bring "a motion for summary judgment on an action for a declaratory judgment." *Id.*

Here, the district court acknowledged that it was going "beyond the present posture" of State Parks' motion to dismiss. 1-ER-41. Rather than simply denying the defendant's motion to dismiss the plaintiff's complaint, it summarily granted final judgment to the plaintiff, without any advance notice or opportunity for the defendant to oppose that final judgment. In granting this relief, it appears that the district court converted the motion to dismiss to a motion for summary judgment, without saying so in its order. But a court may only treat a Rule 12(b)(6) motion as a summary judgment motion if it has given the parties "a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. Proc. 12(d); *see also Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan*, 662 F.2d 641, 645 (9th Cir. 1981) ("If the conversion occurs unexpectedly, the nonmoving party is left at the disadvantage of being unprepared to respond; hence notice is required."). And a court may not "grant summary judgment for a nonmovant" or "consider summary judgment on its own" without first giving the parties notice and a reasonable time to respond. Fed. R. Civ. Proc. 56(f); *see also United States v. Grayson*, 879 F.2d 620, 625 (9th Cir. 1989) (a court generally may not sua sponte grant summary judgment without giving the losing party notice and an opportunity to present new evidence, unless the party has had a "'full and fair opportunity to ventilate the issues involved in the motion'").

Here, State Parks was given no notice that the district court was considering entering a final judgment in Sable's favor. Neither party requested that the court convert the motion to dismiss to a motion for summary judgment, and the court never informed the parties it was considering doing so. As a result, State Parks did not have a "full and fair opportunity" to address the summary judgment motion. In its motion to dismiss, State Parks focused on challenging the sufficiency of Sable's complaint, with the understanding that it would be able to separately oppose any summary judgment motion Sable might bring at a later stage in the case. Had State Parks known that the motion to dismiss would be its final opportunity to avoid an adverse final judgment, it would have included all the materials and arguments pertinent to a summary judgment motion.[7] And because the district court chose not to hold a hearing on the motion to dismiss, *supra* p. 14, State Parks did not have an opportunity to address the court's questions and concerns before final judgment issued. Given that this case has extraordinary consequences for our system of federalism and a sovereign State's property rights, *see, e.g.*, *supra* pp. 18-25, the district court's rush to judgment was especially imprudent and provides an additional basis for reversal.

---

[7] For example, State Parks would have submitted additional evidence regarding its easement negotiations with Sable, including Sable's unwillingness to cooperate with State Parks' requests for sufficient information to evaluate the impacts of a 30-year easement.

## CONCLUSION

The judgment of the district court should be reversed.

Dated: November 12, 2026

Respectfully submitted,

*s/ Jane Reilley*

ROB BONTA
*Attorney General of California*
SAMUEL T. HARBOURT
*Solicitor General*
ELIZABETH ST. JOHN
NORMA FRANKLIN
*Acting Senior Assistant Attorneys General*
SAMUEL P. SIEGEL
*Supervising Deputy Solicitor General*
JANE REILLEY
*Deputy Solicitor General*
JESSICA TUCKER-MOHL
*Supervising Deputy Attorney General*
MATTHEW STRUHAR
ALICE SEGAL
*Deputy Attorneys General*

## STATEMENT OF RELATED CASES

The following related cases are pending before this Court: *California v. Wright*, No. 26-5409; *California v. Pipeline & Hazardous Materials Safety Admin.*, No. 26-508 (*consolidated with Env't Def. Center v. Pipeline & Hazardous Materials Safety Admin.*, No. 25-8059); and *California v. Pipeline & Hazardous Materials Safety Admin.,* No. 26-4629 (*consolidated with Environmental Def. Ctr. v. Pipeline & Hazardous Materials Safety Admin.*, No. 26-6190).

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 26-5643

I am the attorney or self-represented party.

**This brief contains** 6,649 **words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

- [x] complies with the word limit of Cir. R. 32-1.
- [ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.
- [ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).
- [ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.
- [ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
  - [ ] it is a joint brief submitted by separately represented parties.
  - [ ] a party or parties are filing a single brief in response to multiple briefs.
  - [ ] a party or parties are filing a single brief in response to a longer joint brief.
- [ ] complies with the length limit designated by court order dated ______.
- [ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Jane Reilley **Date** November 12, 2026

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*